IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHERI STARR | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  19-920 |
| Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                              April 24, 2020

Cheri Starr ("Plaintiff") seeks review of the Commissioner's decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") denying benefits is supported by substantial evidence and will affirm the Commissioner's decision.

## I.     PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on May 4, 2015, tr. at 332, 440, and for SSI on August 18, 2017.[2]  Plaintiff originally alleged a disability onset date of July 11, 2012, id. at 440, but amended the onset date to June 20, 2014, at the administrative hearing.  Id. at

---

[1]Andrew Saul became the Commissioner of Social Security ("Commissioner") on June 17, 2019, and should be substituted for the former Acting Commissioner, Nancy Berryhill, as the defendant in this action.  Fed. R. Civ. P. 25(d).

[2]The application for SSI and the initial denial are not contained in the voluminous record.  However, the SSI application was referenced at the administrative hearing and noted in the ALJ's decision, and the Commissioner has not contested these references. Tr. at 105, 278; Doc. 18.

280.[3]  She alleged disability as a result of brain injury, cognitive communication deficit, dizziness and giddiness, residual effects from a concussion, temporomandibular joint pain, left shoulder pain, nonallopathic lesions across her body, cervicogenic headache, sleep issues, and a movement disorder.  Id. at 465.  At the hearing, counsel explained that Plaintiff suffers from post-concussion syndrome, multiple mental health diagnoses, and migraines.  Id. at 280.  Plaintiff's applications for benefits were denied initially, id. at 333-37, and Plaintiff requested a hearing before an ALJ, id. at 338-39, which took place on October 18, 2017.  Id. at 273-319.  On April 3, 2018, the ALJ found that Plaintiff was not disabled.  Id. at 105-25.  The Appeals Council denied Plaintiff's request for review on February 8, 2019, id. at 1-3, making the ALJ's April 3, 2018 decision the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1472.

Plaintiff commenced this action in federal court on March 4, 2019.  Doc. 1.  The matter is now fully briefed and ripe for review.  Docs. 13, 18, 19.[4]

## II.   **LEGAL STANDARD**

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve

---

[3]Plaintiff applied for DIB on two prior occasions.  Tr. at 477-78.  Her applications were denied on January 15, 1998, and August 21, 2014, and Plaintiff did not seek further review in either case.  Id.  Neither party asserts that the prior adjudications have any effect on the consideration of Plaintiff's present applications.

[4]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 7.

months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1. Whether the claimant is currently engaged in substantially gainful activity;
>
> 2. If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled and is capable of performing jobs that exist in significant numbers in the national economy.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.   DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff suffered from several severe impairments at the second step of the sequential evaluation; status post traumatic brain injury/post concussive syndrome, migraines with occipital and trigeminal neuralgia, anxiety, depression, shoulder dysfunction with subscapularis tendon thickening, post traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), and asthma. Tr. at 108.  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id., and that Plaintiff retained the RFC to perform sedentary work with certain limitations, the most relevant of which for present purposes is that she perform only unskilled work with no direct interaction with the public.  Id. at 111.  At the fourth step of the evaluation, the ALJ found that Plaintiff could not perform her past relevant work as a nursing assistant and nurse's aide.  Id. at 123.  However, at the fifth step, the ALJ found, based on the testimony of a vocational expert ("VE"), that

Plaintiff could perform work that exists in significant numbers in the national economy, including jobs as an addresser, assembler, and surveillance system monitor.  Id. at 124.

Plaintiff claims that the ALJ (1) failed to explain how she arrived at the RFC determination, (2) failed to properly account for Plaintiff's moderate limitation in concentration, persistence, or pace, and (3) failed to properly consider Plaintiff's symptoms.  Docs. 13 & 19.  Defendant responds that the ALJ's decision is supported by substantial evidence and that she properly accounted for Plaintiff's credibly established limitations and properly evaluated Plaintiff's subjective complaints.  Doc. 18.

### B.    Plaintiff's Claimed Limitations

Plaintiff was born on November 23, 1975.  Tr. at 440.  She worked as a nursing assistant and medication technician until July 2012.  Id. at 282, 311, 466.  Plaintiff completed the twelfth grade and a certified nursing assistant program.  Id. at 466.

Plaintiff testified that she cannot work because she gets headaches every day.  Tr. at 282.  She does not sleep well at night because she cannot get comfortable resting her head or neck on a pillow and takes naps two or three times a day.  Id. at 282, 290.  Plaintiff explained that the skin and scalp on the back of her head are painful to the touch.  Id. at 283.  She described her typical day as spent in bed.  Id. at 282.  Some days she can walk to the kitchen and put something in the crock pot, while other days she needs her husband's help to get out of bed and use the bathroom.  Id. at 287.  Plaintiff has three daughters, who were seventeen, fourteen, and nine years of age at the time of the administrative hearing.  Id. at 281.  They do the chores around the house.  Id. at 289, 303.  Plaintiff also relies on her mother-in-law for childcare when she is unable to take care of

her youngest daughter.  Id. at 294.  Plaintiff's husband explained that everyone, including his parents and his in-laws help.  Id. at 303.  Plaintiff testified that she can drive and has no problems driving.  Id. at 282.  She does the grocery shopping with a small list, but gets exhausted doing a "big shopping cart" worth of shopping.  Id. at 289-90.  Plaintiff's only problem with bathing is getting the ambition to get up to shower.  She can wash and dress herself without difficulty.  Id. at 294-95.

Plaintiff explained that she suffers from different types of headaches.  At the time of the hearing, Plaintiff had a dull headache that she rated a one or two headache, which is tolerable.  Tr. at 291.  However, other days, it can shoot to a six or seven, when she will take Maxalt (defined infra), and if the headache does not subside she will take a second Maxalt which will "wipe [her] out."  Id. at 291, 293.  Once or twice a month her headache pain will be a nine and she goes to the emergency room.  Id. at 291.  When the headaches escalate, she has trouble walking.  Id. at 295.  Plaintiff's husband testified that he can tell when she is having a headache because she "becomes miserable, depressed, withdrawn, upset" and will go into a dark room in silence.  Id. at 306.  Three or four times a week he will come home from work to find her sitting and crying due to the pain. Id.  If she is having a particularly bad week, he finds her that way every day.  Id.

Plaintiff also testified that she suffers from sciatica, which affects her ability to sit. Tr. at 295.  In addition, Plaintiff estimated that she can lift ten pounds with her right arm, but it hurts to use her left arm.  Id. at 295.

With respect to Plaintiff's mental health treatment, she explained that she goes to a therapist once a week to help with her anxiety attacks.  Tr. at 297.  According to Plaintiff,

she gets panic attacks when she goes out of her house, when people come to her house, or even when her children are arguing.  Id.  She describes the panic attack as squeezing at the base of her skull, blurry vision, and racing heart.  Id.  She also suffers from crying spells that are triggered when realizes that she cannot take care of everything.  Id. at 298.

### C.    Summary of Medical Record

Much of the evidence contained in the voluminous administrative record predates Plaintiff's alleged disability onset date.  I begin with a very brief overview of the pre-onset evidence, and then summarize the more recent medical and mental health records. [5]

Plaintiff has a history of multiple head injuries, the first at age 16, after which she began experiencing migraines.  See tr. at 676.  She suffered another head injury on July 11, 2012, when she fell on wet concrete.  Id. at 545, 1006, 1045, 1226.  CT scans and x-rays performed at the time were normal.  See id. at 1011 (x-ray left elbow), 1012 (x-ray left knee), 1013 (x-ray sacral spine and coccyx), 1014 (brain CT).  Thereafter, she was also treated for complaints of migraines, including starting Botox injections[6] with Vitaliy Koss, M.D., of Lehigh Neurology.  Id. at 558, 559, 583-88, 1056.

---

[5]Plaintiff provided a number of medical records after the ALJ's decision.  See Court Transcript Index at 1; tr. at 8-26, 30-101, 134-272.  The court cannot consider this evidence because it was not presented to the ALJ.  See SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947) ("[T]he court can only judge the propriety of the decision with reference to the grounds invoked by the Commissioner when the decision was rendered."); see also Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001) (federal court is reviewing the ALJ's decision as the final decision of the Commissioner, not the Appeals Council's denial of review).

[6]Botox (botulinum toxin) blocks nerve activity in muscles, and among its uses is the prevention of chronic migraine headaches.  See https://www.drugs.com/botox.html (last visited April 9, 2020).

Plaintiff also has a psychiatric history of depressive disorder NOS (not otherwise specified) and PTSD, for which she has been hospitalized multiple times.  See, e.g., tr. at 1023, 1029 (5/16/12–5/17/12 – Reading Hospital – passive suicidality), 600 (7/29/13–8/7/13 – Reading Health – depressive disorder NOS, ADHD), 673-74 (10/3/13–10/5/13 – Reading Health – unresponsive episode with diagnoses of Somatoform Disorder, migraine), 2435-37 (St. Joseph's Medical Emergency Department – 11/3/13-11/4/13 – depression, suicidal), 759-61 (Haven Behavioral – 11/4/13–11/6/13 – depression NOS).

    1.  Medical Evidence

On June 20, 2014, Plaintiff's alleged onset date, she was involved in a car accident when she, as the driver, hit a deer.  Tr. at 980.  She presented to the Reading Hospital Emergency Room where she complained of pain from the back of her knee to her left shoulder blade.  Id.  Radiographic studies of her cervical, lumbar and thoracic spine, abdomen, and pelvis showed no acute abnormality.  Id. at 984-86.

Plaintiff's primary care provider at the time of her alleged disability onset was Ross Fichthorn, PA-C, at Bernville Family Practice.  The treatment records evidence continued complaints of pain in the left side of her head, which radiate down her neck. Tr. at 2947 (9/18/14 – complaints of brachial plexopathy), 2964, 2969 (12/4/14 – complaints of pain in the left side of head radiating down the neck diagnosed as the possible onset of shingles with prescriptions for Valtrex and prednisone[7]).

---

[7]Valtrex is an antiviral drug used to treat infections caused by the herpes viruses. See https://www.drugs.com/valtrex.html (last visited April 9, 2020).  Prednisone is a corticosteroid used as an anti-inflammatory or immunosuppressant.  See https://www.drugs.com/prednisone.html (last visited April 9, 2020).

Prior to the car accident, Plaintiff treated with RPS Physiatry for her headaches. Tr. at 3142. On May 8, 2014, Sanghoon Kim, M.D., referred Plaintiff to neck specialist, Li-Hong Lu, M.D., and prescribed Skelaxin.[8] Id. at 3147. On June 6, 2014, Dr. Lu suggested lidocaine and steroid injections, prescribed Robaxin,[9] and recommended that Plaintiff continue Botox injections. Id. at 3155. On May 18, 2015, Dr. Lu performed lidocaine and steroid injections to block nerves and trigger points. Id. at 3167-69.

After the accident, Plaintiff continued treatment for her migraines and post-concussive syndrome (from the July 2012 fall) with Lehigh Neurology. Tr. at 1051, 1480. Although Plaintiff continued to experience daily headaches, Kathleen Canfield, PA-C, noted on June 25, 2014, that Plaintiff said that the headaches are "not as sharp" since beginning Botox injections. Id. at 1051. Dr. Koss diagnosed Plaintiff with chronic migraine, for which she was treated with courses of Botox; occipital neuralgia for which the doctor performed bilateral occipital nerve blocks; post traumatic headache for which she was to continue with cognitive therapy; cervicalgia for which the doctor performed left trapezius trigger point injections; fatigue for which the doctor recommended regular exercise; hypersomnia; and migraine with unilateral motor symptoms, for which the

---

[8]Skelaxin is a muscle relaxant. See https://www.drugs.com/skelaxin.html (last visited April 9, 2020).

[9]Robaxin is a muscle relaxant. See https://www.drugs.com/robaxin.html (last visited April 9, 2020).

doctor prescribed Migranal[10] and ibuprofen.  Id. at 1054-55.  In August 2014, Kathryn

Sumner, CRNP, noted that Plaintiff's last Botox injections were in May, that it was a

"very helpful preventative for migraines," and that Plaintiff was due for Botox injection,

coinciding with the return of the headaches.  Id. at 1492.  Ms. Sumner also noted that

Migranal was no longer effective, naratriptan was effective at aborting the headaches but

not covered by insurance and Imitrex[11] worked about fifty percent.  Id.  The following

month, Dr. Koss administered another Botox injection, noting that "Botox helps 30%,"

decreasing the severity from 9/10 to 7/10.  Id. at 1485, 1488.  In October 2014, Ms.

Canfield noted that Botox decreased the severity of Plaintiff's migraines and that

occipital injections and trigger point injections have provided "significant relief" for up to

two months.  Id. at 1480.

Prior to her alleged disability onset date, Plaintiff was also treated by Norman

Stempler, D.O., at Berks County Orthopedics for chronic headaches, neck and back pain.

Tr. at 2573.  She continued treating with Dr. Stempler sporadically through February of

2015.  Id. at 2565-73.  Dr. Stempler diagnosed Plaintiff with post concussion syndrome,

cervical and thoracic sprain and strain with myofascitis, and myofascial syndrome.  Id. at

2574.  He prescribed physical therapy and chiropractic treatment.  Id. at 2575.  In

---

[10]Migranal is a nasal spray used for the acute treatment of migraine headaches, not
for the prophylactic therapy of migraines.  It works by narrowing blood vessels in the
brain.  See https://www.drugs.com/mtm/migranal-nasal.html (last visited April 23, 2020).

[11]Naratriptan are Imitrex are both used to treat migraine headaches that have
already begun by narrowing blood vessels around the brain.  See
https://www.drugs.com/mtm/naratriptan.html (last visited April 23, 2020);
https://www.drugs.com/imitrex.html (last visited April 23, 2020).

February 2015, the doctor referred Plaintiff to Reading Neck and Spine, and if she had no relief, planned to refer her to pain management.  Id. at 2566.

On September 15, 2014, Plaintiff was seen at St. Joseph's Medical Emergency Department for a headache.  Tr. at 2427.  She was treated with Reglan and Toradol[12] and released.  Id. at 2429, 2431.

Plaintiff was also followed by Joseph Schellenberg, M.D., at LVPG Pulmonary and Critical Care, for management of her hypersomnolence and shortness of breath.  Tr. at 1536, 1546.  In March 2015, Plaintiff reported continued daytime sleepiness and occasional trouble getting to sleep likely due to anxiety for which she uses clonazepam.[13] Id.  The doctor noted her depressed mood, continued her on Adderall[14] and recommended follow up with her primary care physician and psychiatrist for the management of her anxiety and depression.  Id. at 1538.

On March 26, 2015, Plaintiff began treating at the Head Trauma and Concussion Center and was seen by Daniele Shollenberger, CRNP.  Tr. at 1419, 2635-44.  Ms. Shollenberger noted that Plaintiff had decreased range of motion in her neck and Plaintiff

---

[12]Reglan is used to help reduce nausea and heartburn.  See https://www.drugs.com/reglan.html (last visited April 9, 2020).  Toradol is a non-steroidal, anti-inflammatory drug used short-term to treat moderate to severe pain.  See https://www.drugs.com/toradol.html (last visited April 9, 2020).

[13]Clonazepam (brand name Klonopin) is a benzodiazepine used to treat seizure disorders and panic disorder.  See https://www.drugs.com/clonazepam.html (last visited April 9, 2020).

[14]Adderall (generic amphetamine and dextroamphetamine) is a central nervous system stimulant used to treat ADHD and narcolepsy.  See https://www.drugs.com/adderall.html (last visited April 9, 2020).

swayed during a test of balance.  Id. at 2638, 2639.  Ms. Shollenberger diagnosed Plaintiff with concussion and cognitive communication deficits, and prescribed speech and physical therapy for vestibular evaluation at Healthsouth Reading Rehabilitation Hospital ("Healthsouth").  Id. at 2641-42.[15]  She instructed Plaintiff to participate in ten to thirty minutes each of daily brain stimulating activity and aerobic exercise, no climbing any distance off the floor, no pushing, pulling, straining or stretching, and minimal bending.  Id. at 1419.  On April 24, 2015, Ms. Shollenberger noted that Plaintiff fell backwards during the balance test, and ordered an MRI/MRA.  Id. at 2649, 2651.

On May 29, 2015, Plaintiff was admitted to Reading Health with complaints of headaches and visual loss.  Tr. at 1216.  Scans of her neck and head were normal, and she was released the following day.  Id. at 1216-17.  On July 9, 2015, Plaintiff again saw Dr. Lu. for complaints of chronic headache and neck pain for the past two and one-half years. Id. at 1698, 2684.  On examination, Dr. Lu found Plaintiff had muscle spasms in her cervical and thoracic spine, with limitation in range of motion of her head, neck, and left shoulder, and a positive Tinel's sign.[16]  Id. at 1699, 2685.  Dr. Lu proceeded to do a series of injections to alleviate Plaintiff's neck pain and headaches.  Id. at 1705 (7/9/15 –

---

[15]At the time of her alleged disability onset, Plaintiff had been treating with Healthsouth for vestibular therapy following her 2012 head injury, which included physical, speech, and psychological therapies.  Tr. at 1225-1347, 2702-2803 (treatment notes 4/15/14–8/5/14); 1698 (reference to vestibular therapy with no improvement in her dizziness).

[16]Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) at 1896.

trigger point and nerve block injections at the great occipital nerve, upper trapezius, and C2-3 joint); 1766-67 (7/16/15 – great occipital nerve block); 1820 (8/6/15 – injections to the left trapezius trigger points and left C2-3 and C3-4 facet joints).  Plaintiff reported to Dr. Lu that the injections decreased her neck pain and headache for several days.  Id. at 1759.

In the Healthsouth Neuropsychological Discharge Summary prepared on August 5, 2014, tr. at 1225, 2702, David Nicodemus, M.A., found Plaintiff suffered from status post cerebral concussion with positive loss of consciousness of unspecified duration, persistent post concussion disorder, neurocognitive disorder, NOS, pain disorder associated with medical conditions and psychological factors, and adjustment disorder with mixed features of depression and anxiety.  Id. at 1231, 2708.  The doctor recommended Plaintiff continue working with her medical specialists on the post-concussion symptoms, continue with psychiatry to help deal with depression and mood, and focus on accommodations and adaptations to allow her to function more appropriately.  Id. at 1232, 2709.

On April 10, 2015, Plaintiff began a course of physical therapy with Healthsouth, which ended on April 23, 2015, after the five authorized visits.  Tr. at 2656-66.

In August 2015, PA Fichthorn referred Plaintiff to internal medicine for a "more coordinated approach to her care."  Tr. at 2985.  Plaintiff began treating with RHPN Internal Medicine that same month, complaining of fatigue, generalized weakness, headaches and migraine episodes, with a history of concussion and a fall in 2012.  Id. at 1570.  At that time, Vinod Chacko, M.D., continued Plaintiff on Ventolin, Imitrex,

Symbicort, amphetamine-dextroamphetamine, Vitamin D and ibuprofen.[17]  Id.  Plaintiff

returned on September 3, 2015, complaining of a burning pain in her left lower back, a

feeling that something was in her left eye, and a blister rash on her left thumb and chest.

Id. at 1590.  Dianne Mulreaney, CRNP, referred her for x-rays of her lumbar spine and an

ophthalmology consult.  Id. at 1599-1600.  Plaintiff was again seen by Dr. Chacko on

October 20, 2015, complaining of fatigue and neck pain.  Id. at 1642.  The doctor

indicated that Plaintiff did have tenderness in her cervical back, but no swelling, bony

tenderness, pain, or spasm.  Id. at 1643.  The doctor ordered x-rays of the chest and

cervical spine, and an echocardiogram.  Id. at 1644.  On November 19, 2015, Plaintiff

returned to Dr. Chacko complaining of neck pain which the doctor described as a

"recurrent problem," and migraines which he described as a "chronic problem," the latest

episode beginning in the prior seven days.  Id. at 1909.  Dr. Chacko referred Plaintiff to

neurology and an orthopedic surgeon.  Id. at 1914.

On February 4, 2016, Plaintiff returned to RHPN Internal Medicine and saw

Manuja Joshi, M.D., with complaints of recurrent, intermittent episodes of pain behind

her left eye, which she described as "excru[c]iating."  Tr. at 1933.  The doctor began

---

[17]Ventolin (generic albuterol) is a bronchodilator used to treat or prevent
bronchospasm in people with asthma or other chronic obstructive pulmonary disease.
See https://www.drugs.com/ventolin.html (last visited April 9, 2020).  Symbicort
contains a combination of budesonide, a corticosteroid that reduces inflammation, and
formoterol, a long acting bronchodilator, used to control and prevent the symptoms of
asthma.  See https://www.drugs.com/symbicort.html (last visited April 9, 2020).

Plaintiff on a trial of Maxalt.[18]  Id. at 1941.  On February 29, 2016, Lewis Winans, M.D., saw Plaintiff for complaints of cough and shortness of breath, ordered a chest x-ray and prescribed doxycycline and guaifenesin with codeine.[19]  Id. at 1964.  On March 9, 2016, she returned with worsening symptoms and Tuyet Thi Parker, P.A., diagnosed asthmatic bronchitis and prescribed albuterol and prednisone.  Id. at 1984.  Plaintiff's symptoms resolved by March 16, 2016, and Plaintiff noted that the doxycycline also resolved chronic joint and muscle pain.  Id. at 2004.  Ms. Parker referred Plaintiff to rheumatology and pulmonology.  Id. at 2006.

On July 15, 2016, Fatima Karabashova, M.D., saw Plaintiff at RHPN Internal Medicine for complaints of headaches, for which the doctor prescribed Medrol Dosepak[20] and strongly recommended that she see a neurologist.  Tr. at 2134.  On August 10, 2016, Plaintiff saw Rashmi Agarwal, CRNP, at the Hershey Medical Center department of neurology.  Id. at 2474.  In a letter to Dr. Karabashova, Mr. Agarwal reviewed Plaintiff's symptomatology and past treatment, and explained that he was reviewing past test results and expected to follow up with Plaintiff in the next two weeks.  Id. at 2476.  During a visit on August 19, 2016, Dr. Karabashova reminded Plaintiff to follow up with the

---

[18]Rizatriptan (brand name Maxalt) is used to treat migraines.  It is not a prohylactic.  See https://www.drugs.com/international/rizatriptan.html (last visited April 9, 2020).

[19]Doxycycline is an antibiotic.  See https://www.drugs.com/doxycycline.html (last visited April 9, 2020).  Guaifenesin is an expectorant used to reduce congestion.  See https://www.drugs.com/guaifenesin.html (last visited April 9, 2020).

[20]Medrol Dosepak is a steroid that prevents the release of substances in the body that cause inflammation.  See https://www.drugs.com/mtm/medrol-dosepak.html (last visited April 24, 2020).

neurologist.  Id. at 2168.  On September 7, 2016, Ms. Parker ordered a CT of Plaintiff's

sinuses.  Id. at 2199.  After the CT scan and a visit to an ENT, the doctors concluded that

her symptoms were not related to her sinuses.  Id. at 2224.[21]  Plaintiff again saw Dr.

Karabashova on December 22, 2016.  When the doctor asked about Plaintiff's pain issue,

Plaintiff became "openly impatient," criticized the doctor, and ultimately walked out.  Id.

at 2224-25.  The doctor advised Plaintiff's husband that Plaintiff would have to find

another primary care physician.  Id. at 2225.

Plaintiff followed up with neurologist Stephen Ross, M.D., and Mr. Agarwal at

Hershey on December 30, 2016, at which time Dr. Ross prescribed amitriptyline for

prohylaxis, diclofenac for mild-to-moderate headaches, and Toradol for severe attacks.[22]

Tr. at 2528.  The doctor also ordered physical therapy and referred Plaintiff to pain

management.  Id. at 2529.  On January 18, 2017, Plaintiff began outpatient physical

therapy at Penn State Health St. Joseph, at which time she rated her pain at 5/10.  In an

update in March 2017, Jim Wodicks, PT, DPT, indicated that Plaintiff had attended nine

of the eleven scheduled sessions including therapeutic exercises, manual therapy, and

---

[21]On October 25, 2016, Plaintiff was seen at St Joseph Medical Emergency
Department for a headache, given Toradol, and released.  Tr. at 2420-23.  Plaintiff was
seen at the Urgent Care in Strausstown on November 21, 2016, complaining of a sharp
headache.  Id. at 3185.  Larry Arnold, PA-C, prescribed Decadron and Toradol.  Id. at
3187.  The following day, Plaintiff was seen in the Emergency Department of Reading
Hospital again complaining of a headache, given Toradol and released.  Id. at 3296, 3302.

[22]Amitriptyline is an antidepressant.  See
https://www.drugs.com/amitriptyline.html (last visited April 9, 2020).  Diclofenac is a
non-steroidal anti-inflammatory drug used to treat mild to moderate pain related to
osteoarthritis or rheumatoid arthritis, and is used to treat migraine headaches.  See
https://www.drugs.com/diclofenac.html (last visited April 9, 2020).

electric stimulation, and noted that her pain level was 4-5/10.  Id. at 2459.  Plaintiff was

discharged from therapy on May 5, 2017, because she had not attended therapy since

March 10, 2017.  Id. at 2456.

On January 27, 2017, Plaintiff began treatment at Hershey's Pain Management

Clinic with David Giampetro, M.D., and Darko Bijelic, CRNP.  Tr. at 2520.  At that time,

Mr. Bijelic noted that Plaintiff was attending physical therapy three days a week, using a

TENS unit, and taking Toradol, diclofenac, and ibuprofen for her headaches.  Id. at 2520.

Dr. Giampetro referred Plaintiff for occipital nerve block and trigger point injections,

which were performed by Bunty Shah, M.D., on February 2, 2017.  Id. at 2513-14, 2522.

On February 24, 2017, Plaintiff began treating with Strausstown Family Practice

as her primary care provider.  Tr. at 3249.  She was seen by Krista Schenkel, D.O., who

indicated that Plaintiff's occipital neuralgia was improving with Neurontin[23] and occipital

nerve blocks, her migraines were stable, and she was monitored by neurology for

migraine and memory loss.  Id. at 3249-51.  On March 10, 2017, Dr. Schenkel's notes

indicate that Plaintiff considered Neurontin a "miracle drug."  Id. at 3238.  On April 11,

2017, Plaintiff was seen complaining of severe vertigo and Dr. Schenkel deferred any

orders because Plaintiff had a neurology appointment the following week.  Id. at 3228.

On July 11, 2017, Plaintiff was complaining of left shoulder pain, for which Dr. Schenkel

ordered a cervical and left shoulder MRI and recommended the use of non-steroidal anti-

inflammatory drugs.  Id. at 3207.  On August 25, 2017, Plaintiff continued to complain of

---

[23]Neurontin (generic gabapentin) is an anti-convulsant used to treat nerve pain.
See https://www.drugs.com/neurontin.html (last visited April 9, 2020).

left shoulder pain.  Id. at 3197.  The doctor noted that Plaintiff had not had the MRI and expressed concern that Plaintiff was suffering from impingement syndrome.  Id.  She advised Plaintiff to follow up with pain management for injections in the neck and to increase her gabapentin.  Id.

On April 19, 2017, Plaintiff began treatment with Richard Close, M.D., at RHPN Spine and Brain ("Spine and Brain"), who diagnosed Plaintiff with cluster headaches with associated occipital headaches.  Tr. at 2364, 2373.  The doctor ordered an MRI and MRA and recommended that Plaintiff be followed by a headache specialized neurologist to reconcile her medications with her psychiatric medications.  Id. at 2373.  On April 21, 2017, Plaintiff saw nurse practitioner Agarwal and Dr. Ross at the Neurology Clinic in Hershey for follow up of her headaches.  Id. at 2502.  Mr. Agarwal indicated that he would like an updated brain MRI, and a series of other laboratory testing.  Id. at 2504.  Due to vertiginous symptoms, Mr. Agarwal also referred Plaintiff to the ENT department at Hershey and recommended she follow up with pain management.  Id.  He also suggested a re-trial of Cymbalta for prevention or tizanidine, or gabapentin.[24]  Id.  Mr. Agarwal prescribed meclizine[25] for Plaintiff's dizziness and recommended she continue with physical therapy.  Id.

---

[24]Cymbalta is an antidepressant used to treat major depressive disorder ("MDD") and generalized anxiety disorder and is used to treat fibromyalgia and nerve pain.  See https://www.drugs.com/cymbalta.html (last visited April 9, 2020).  Tizanidine is a muscle relaxer.  See https://www.drugs.com/tizanidine.html (last visited April 9, 2020).

[25] Meclizine is an antihistamine used to treat or prevent nausea, vomiting, and dizziness caused my motion sickness.  See https://www.drugs.com/meclizine.html (last visited April 23, 2020).

Plaintiff sought treatment from the Center for Pain Control on July 6, 2017.  Tr. at 2536-38.  Jason Bundy, M.D., discontinued gabapentin and started a trial of Lyrica,[26] recommended an MRI, which Plaintiff's family doctor ordered but insurance had not approved, and requested an x-ray of the right shoulder.  Id. at 2537.

On July 19, 2017, Plaintiff followed up with the Neurology Clinic at Hershey.  Tr. at 2495.  Nurse practitioner Agarwal noted that Plaintiff was then taking gabapentin for her pain, but was not able to tolerate the daily dosage due to fatigue.  Id.  He also indicated that she failed Lyrica, and prescribed a trial of Lamictal, and told her to continue using rizatriptan for abortive treatment.[27]  Id. at 2496.  On July 21, 2017, Robert Saadi, M.D., updated nurse practitioner Agarwal on Plaintiff's treatment in the Neuro-otology Clinic at the Hershey Medical Center.  Id. at 2482.  Dr. Saadi opined that Plaintiff's head and neck pain were due to her neurologic issues and recommended that Plaintiff follow up with Thomas Jefferson Headache Clinic.  Id. at 2483.

On August 4, 2017, Plaintiff followed up with Dr. Bundy at the Center for Pain Control, who had little to offer until the MRI of Plaintiff's neck was completed, at which time he would determine if she was a candidate for interventional therapy.  Tr. at 2540.

---

[26]Lyrica is an anticonvulsant used to treat seizures and is also used to treat fibromyalgia and nerve pain.  See https://www.drugs.com/lyrica.html (last visited April 9, 2020).

[27]Lamictal is an anticonvulsant used to treat seizures and also used to treat bipolar disorder.  See https://www.drugs.com/lamictal.html (last visited April 9, 2020).

The x-rays of her left shoulder were normal.  Id. at 2541.[28]  The cervical MRI was
completed on August 16, 2017, and on September 5, 2017, Dr. Bundy noted that the MRI
showed only mild degenerative disc disease.  Id. at 3067.  He suggested an epidural
steroid injection to C7 to T1, which Plaintiff declined, and also suggested that her
shoulder pain may involve the rotator cuff and requested an MRI of the left shoulder.  Id.
at 3067.

Plaintiff followed up with Spine and Brain on September 8, 2017, for complaints
of headache, dizziness, skull pain, and blurred vision.  Tr. at 3091.  Karen Kimball,
CRNP, noted that Plaintiff's health insurance had denied the order for a brain MRI/MRA,
and again ordered an MRI of the brain and MRA of the head and neck.  Id. at 3091, 3095.
On November 27, 2017, Plaintiff was seen by Michael Marmura, M.D., at Jefferson
Headache Center, who diagnosed Plaintiff with hemicrania continua (constant one-sided
headache), and prescribed prochlorperazine.[29]  Id. at 3335-38.

The record also contains medical assessments relating to Plaintiff's disability
applications.  Ziba Monfared, M.D., conducted a neurological examination on November
23, 2015, at which time Plaintiff was taking amphetamine, clonazepam, ibuprofen, and
Ventolin.  Tr. at 1427, 1428.  Dr. Monfared diagnosed Plaintiff with chronic headache,

---

[28]On September 2, 2017, Plaintiff was seen at Cape Regional Medical Center's
Emergency Department complaining of a left sided headache.  Tr. at 3078-79.  She was
given Toradol and Zofran, an anti-nausea drug, and released.  Id. at 3080.

[29]Prochlorperazine is used to treat nervous conditions and non-psychotic anxiety,
and to control nausea and vomiting.  See
https://www.drugs.com/cons/prochlorperazine.html (last visited April 9, 2020).

neck and left shoulder pain, visual disturbance and a history of vertigo and asthma.  Id. at

1429.  The doctor concluded that Plaintiff could frequently lift and carry up to 100

pounds, sit for eight hours and stand and walk for four hours each in an eight-hour day.

Id. at 1433-34.

Krista Schenkel, D.O., completed an RFC Questionnaire on March 10, 2018.  Tr.

at 1448.[30]  Dr. Schenkel indicated that Plaintiff would constantly experience pain that

would interfere with attention and concentration, that she was incapable of even low

stress jobs, and could sit for two hours and stand/walk for two hours in an eight-hour day.

Id. at 1448-50.  The doctor also opined that Plaintiff could rarely lift less than ten pounds.

Id. at 1450.

At the initial consideration stage, Robert Balogh, Jr., M.D., found that Plaintiff's

physical impairments resulted in limitations to her RFC, including that she could

occasionally lift and/or carry fifty pounds, frequently lift/carry twenty five pounds, stand

and walk six hours, and sit for six hours in an eight-hour workday, and that she had no

postural, manipulative, visual, communicative, or environmental limitations.  Tr. at 328.

2.  Mental Health Treatment Evidence

After her June 2014 accident, Plaintiff continued psychiatric treatment through

Reading Health System.  On August 11, 2014, Jeffrey Seley, M.D., found that Plaintiff

had a dysthymic mood and constricted affect, and fair attention/concentration, and

---

[30]Dr. Schenkel stated that she saw Plaintiff on February 24, 2017, and that she
"only saw once before," referencing Plaintiff's treatment with PA Fichthorn since
childhood.  Tr. at 1448.

diagnosed Plaintiff with dysthymic disorder.[31]  Tr. at 1462.  He began Plaintiff on

Cymbalta.  Id. at 1463.

Plaintiff began a mental health treatment plan with Family Guidance Center on

May 22, 2015, complaining of depression and an inability to regulate her emotions.  Tr.

at 1372, 1378.  At that time, Jennifer Miller, M.A., diagnosed Plaintiff with PTSD, MDD,

recurrent episode, mild, and ADHD, with a Global Assessment of Functioning ("GAF")

score of 45.[32]  Id. at 1375.  On September 9, 2015, Heather Joseph, D.O., diagnosed

plaintiff with MDD, recurrent episode, severe, with a GAF score of 50, and indicated that

Plaintiff was prescribed fluoxetine and Klonopin.[33]  Id. at 1368.  On November 18, 2015,

Dr. Joseph prescribed Adderall.  Id. at 2414-15.  Plaintiff's primary diagnosis was MDD,

recurrent episode, moderate, and the doctor also diagnosed mild neurocognitive disorder.

---

[31]"The essential feature of persistent depressive disorder (dysthymia) is a depressed mood that occurs for most of the day, for more days than not, for at least 2 years . . . ."  Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM-5"), at 169.

[32]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM-IV-TR") at 32.  A GAF score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.  The DSM-5, which replaced the DSM-IV-TR, eliminated reference to the GAF score.  However, the Commissioner continues to receive and consider GAF scores in medical evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case file.  Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa, 2016).

[33]Fluoxetine (brand name Prozac) is an antidepressant.  See https://www.drugs.com/fluoxetine.html (last visited April 9, 2020).

Id. at 2415.  On mental status exam, the doctor noted Plaintiff's euthymic mood, depressed mood, and blunted affect, but indicated that Plaintiff's memory and cognition were intact and her judgment was good with intact decision-making capacity.  Id. at 2414-15.

On January 6, 2016, Dr. Joseph added trazodone[34] to Plaintiff's regimen and Plaintiff's MSE remained unchanged except her affect was full range and appropriate. Tr. at 2413.  In May 2016, Dr. Joseph prescribed clonazepam and bupropion.[35]  Id. at 2408.  In June, the doctor discontinued bupropion.  Id. at 2406-07.  Plaintiff's memory remained intact, and her insight and judgment were good.  Id. at 2406.  In November 2016, Courtney Walker noted Plaintiff's euthymic and depressed mood.  Id. at 2402.  On January 31, 2017, Doreen Storz, PA-C, found Plaintiff's mood was depressed and anxious.  Id. at 2400.  On May 31, 2017, Ms. Storz's notes indicate that Plaintiff's neurologist had prescribed Neurontin which is helping her pain, but not her anxiety.  Id. at 2398.  Plaintiff's mood remained depressed and anxious.  Id. at 2399.

The record contains two functional assessments respecting Plaintiff's mental abilities.  On September 26, 2016, Ms. Miller and Courtney Walker, D.O., from Family Guidance Center, completed a Mental Impairment Questionnaire, indicating that Plaintiff suffered from MDD, PTSD, ADHD, and mild neurocognitive disorder.  Tr. at 1442.  The clinicians indicated that Plaintiff's symptoms included decreased energy, impairment in

---

[34]Trazodone is an antidepressant.  See https://www.drugs.com/trazodone.html (last visited April 9, 2020).

[35]Bupropion is an antidepressant.  See https://www.drugs.com/bupropion.html (last visited April 9, 2020).

impulse control, mood disturbance, emotional withdrawal and isolation, disorientation to time and place, perceptual/thinking disturbances, emotional lability, easy distractibility, memory impairment, and sleep disturbance.  Id. at 1443.  In assessing Plaintiff's mental abilities to do unskilled work, Dr. Walker and Ms. Miller indicated that Plaintiff was seriously limited in the abilities to understand, remember, and carry out simple instructions, and ask simple questions or request assistance; was unable to meet competitive standards in twelve of the sixteen categories; and had no useful ability to deal with normal work stress.  Id. at 1444.  In addition, with respect to Plaintiff's mental abilities to do semiskilled and skilled work, Dr. Walker and Ms. Miller indicated that Plaintiff would be unable to meet competitive standards in the areas of understanding, remembering, and carrying out detailed instructions, and set realistic goals; and no useful ability to deal with the stress of semiskilled or skilled work.  Id. at 1445.  They also found that Plaintiff was seriously limited in, but not precluded from, interacting with the public, maintaining appropriate behavior, and adhering to basic standards of neatness and cleanliness; and had no useful ability to travel in unfamiliar places or use public transportation.  Id. at 1445.  They concluded that Plaintiff had marked limitation in activities of daily living, and extreme limitation in maintaining social functioning, maintaining concentration, persistence or pace, and that she had four or more episodes of decompensation within the prior twelve months lasting at least two weeks.  Id. at 1446.

On December 2, 2015, at the initial review stage, Richard Williams, Ph.D., found that Plaintiff suffered from late effects of cerebrovascular disease, which he categorized as severe, and organic mental disorders, which he categorized as non-severe.  Tr. at 326.

He found that her mental impairments caused mild limitations in maintaining social

functioning and maintaining concentration, persistence, and pace.  Id.

     **D.**     **Consideration of Plaintiff's Claims**

          1.     Physical RFC Assessment

Plaintiff first complains that the ALJ failed to set forth a supported rationale for

her determination that Plaintiff could perform sedentary work, arguing that "[t]he ALJ's

rejection of all of the opinion evidence . . . created an 'evidentiary deficit' that she could

not reasonably fill with her lay medical opinion."  Doc. 13 at 7 (citing Suide v. Astrue,

371 F. App'x 684, 690 (7th Cir. 2010)).  Defendant responds that the ALJ properly

evaluated the medical opinions of record, and relied on the medical findings, diagnostic

testing results, and Plaintiff's activities in determining Plaintiff's RFC.  Doc. 18 at 6-12.

RFC is defined as "the most [an individual] can still do despite [her] limitations."

20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  More specifically, an RFC assessment

determines "what an individual can do in a work setting in spite of the functional

limitations and environmental restrictions imposed by all of his or her medically

determinable impairment(s)."  S.S.R. 83-10, Titles II and XVI:  Determining Capability

to do Other Work – the Medical-Vocation Rules of Appendix 2, 1983 WL 31251, at *7

(Jan. 1, 1983).  The ALJ is responsible for assessing the claimant's RFC once the case

reaches the administrative hearing level.  20 C.F.R. §§ 404.1546(c), 416.946(c).  The

ALJ is required to consider the impact of both severe and non-severe impairments when

assessing a claimant's RFC.  See id. §§ 404.1523, 416.923 ("[W]e will consider the

combined effect of all of your impairments without regard to whether any such

impairment, if considered separately, would be of sufficient severity."). The ALJ must include all credibly established limitations in the RFC and in the hypothetical posed to the VE.  Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).

As previously noted, here the ALJ found that Plaintiff retained the RFC to perform a limited range of sedentary work.  Tr. at 111.  The ALJ conducted a ten-page review of the medical record throughout which the ALJ noted the predominantly normal diagnostic findings including; stroke workup in September 2013, id. at 113 (citing id. at 561, 629), CT and MRI of the head in August 2013, id. at 115 (citing id. at 629, 664), MRI of the cervical spine, CT of the cervical spine and brain, x-rays of the lumbosacral spine, coccyx, left knee, and left elbow, MRI of the brain, and EEGs in spring of 2014, id. at 117 (citing id. at 2570), CT scan for left-sided head and eye pain in December 2013, id. at 117 (citing id. at 978), head CT in May 2015, id. at 118 (citing 1216-17), CT of the cervical, lumbar, and thoracic spine in June 2014 showed only mild disc protrusion at L4-5, id. at 118 (citing 2074-77), x-ray of lumbar spine in September 2015, id. at 118 (citing id. at 2082), x-ray of cervical spine in October 2015, id. at 118 (citing id. at 2086),[36] head CAT in September 2014, id. at 118 (citing id. at 2417), x-rays of cervical spine in October 2016 showed only minimal degenerative changes shown on, id. at 118 (citing id. at 2418), cervical MRI in August 2017 showed only mild degenerative changes at C3-C4, id. at 120 (citing id. at 3278), x-ray of left shoulder in July 2017, id. at 121 (citing id. at

---

[36] The ALJ indicates that this was a CT scan, but no CT scan of the cervical spine was done during this hospital admission.  The x-ray of the cervical spine was performed during the October 2016 admission.  Tr. at 2086.

3277), MRA of head and neck in September 2017, id. at 121 (citing id. at 3272), MRI of brain in September 2017 showed "'small scattered' foci" within the white matter, id. at 121 (citing id. at 3270), MRI of left shoulder in October 2017, showed some thickening which could reflect tendinopathy or partial tear.  Id. at 121 (citing id. at 3279).

The ALJ conducted a similarly thorough review of the predominantly normal physical examination results in the record.  The ALJ noted that during the relevant period, in the emergency room after hitting the deer in June 2014, "[Plaintiff] was negative for head, respiratory, musculoskeletal, and neurological symptoms" with "normal orientation, head, pulmonary system, musculoskeletal system, straight leg raising test, neurological system, psychiatric system, mood, affect, behavior, and thought content."  Tr. at 117 (citing id. at 981-82).  "[Neurological e]xaminations in June, August and October 2014 showed bilateral occipital nerve tenderness and left trapezius muscle spasm, but were otherwise normal," and "[e]xaminations in September and December 2014 were entirely normal."  Id. at 117-18 (citing id. at 1053, 1476, 1481-82, 1487-88, 1493-94).  Physical examinations by pulmonologists in July 2014 and September 2015 in connection with Plaintiff's day-time sleepiness and sleep difficulty, were normal.  Id. at 119 (citing id. at 1542, 1547).  Similarly, the ALJ noted normal physical examinations by Plaintiff's internal medicine provider in August, September, October and November 2015, id. at 119 (citing 1560, 1590, 1643,[37] 1910), and February, May, July, August, and September 2016, id. at 119-20 (citing id. at 1967, 2050, 2134, 2167, 2205-06).  The ALJ

---

[37]Plaintiff exhibited tenderness in her cervical back during the October 20, 2015 examination.  Tr. at 1643-44.

also noted Plaintiff's normal physical exams by her primary care provider in November 2016, id. at 120 (citing id. at 3186), and February and April 2017.  Id. at 120 (citing id. at 3228, 3250).  Likewise, the ALJ noted that Dr. Close's notes indicated a normal physical examination in April 2017, id. at 120 (citing id. at 2372), and similar findings in September 2017.  Id. at 120 (citing id. at 3094-95).

The ALJ noted the exercise and brain stimulation activities recommended by CRNP Shollenberger in March 2015.  Tr. at 119 (citing id. 1419, 2640).  The ALJ also acknowledged the few examinations that revealed abnormal physical results.  Id. at 120 (noting that Dr. Lu observed cervical muscle spasms and tenderness with limited range of motion of the head and left shoulder in July and August 2015) (citing id. at 1764, 1816-17), 120-21 (pain management noted "tenderness over the left trapezius, tenderness of cervical facets, left occipital tenderness, and tenderness along the left acromioclavicular joint" and similar findings in July and September 2017) (citing id. at 2536, 3066).

After her thorough review of the evidence, the ALJ summarized her findings.

> The relatively modest and many normal findings throughout these examinations and pursuant to diagnostic testing, the conservative nature of treatment, the sporadic nature of symptoms and findings, the recommendations to engage in daily aerobic exercise and brain stimulating exercise, and the lack of organic cause for many of [Plaintiff's] complaints, are all inconsistent with the [Plaintiff's] allegations as to the extent of her work-related limitations, but consistent with her ability to perform a range of sedentary work, in accordance with the parameters of the above [RFC].

Tr. at 121.

In addition to the medical evidence, the ALJ relied on Plaintiff's activities in considering her physical complaints and abilities.

> A further review of [Plaintiff's] testimony and statements demonstrates that her activities are more extensive and her capabilities are greater than would be expected of one who is alleging disabling impairments and limitations. . . . [Plaintiff] takes care of her 3 daughters. She has no difficulties dressing and feeding herself, and using the toilet. [Plaintiff] prepares her own meals, including meals in a crockpot, and sandwiches. She bathes her youngest daughter, and does her own laundry and that of her youngest daughter. [Plaintiff] goes outside 3 to 5 times per day. She is able to go outside alone, and drives at least short distances. [Plaintiff] shops in stores for groceries. [Plaintiff] has no difficulty bathing herself. [Plaintiff] indicated that she has no problems getting along with family, friends, neighbors, and others. She stated that she gets along "good" with authority figures, and has never lost employment due to difficulty getting along with others. She spends time with her husband and daughters, and occasionally with extended family. [Plaintiff] attends her daughters' sports events 1 to 2 times per week. [Plaintiff] does some gardening and testified that her asthma is usually controlled.

Tr. at 112 (record citations omitted).

Plaintiff argues that the ALJ failed to adequately explain her RFC determination. Doc. 13 at 7; Doc. 19 at 1. Plaintiff is incorrect. As the above summary shows, the ALJ engaged in a thorough narrative discussion of the relevant evidence, including contradictory evidence, in determining Plaintiff's RFC. Such a narrative discussion of the evidence complies with governing regulations and case law. See, e.g., Carrozza v. Comm'r of Soc. Sec., Civ. No. 15-4737, 2016 WL 3901010 (E.D. Pa. July 19, 2016) ("Courts within the Third Circuit have . . . declined to remand cases for lack of a written function-by-function analysis when the ALJ's RFC determination was otherwise

supported by substantial evidence.") (citations omitted). Here, the ALJ discussed Plaintiff's history of impairments, including evidence predating her alleged disability onset date, as well as diagnostic evidence, objective findings from multiple examinations, medical opinions, which will be discussed shortly, the nature and extent of Plaintiff's treatment history, and Plaintiff's testimony and functional reports. For all the above reasons, I find no error in the ALJ's exposition of the RFC assessment.

As noted, Plaintiff argues that "[r]ather than using one of the resources available to her to properly support her finding, the ALJ erred by forging ahead with her independent assessment of [P]laintiff's abilities to fill the evidentiary gap based on her own interpretation of the medical evidence." Doc. 13 at 7. This argument finds its genesis in this circuit in Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986), in which the Third Circuit held that the ALJ's decision that the plaintiff was able to perform light work was not supported by substantial evidence because "[n]o physician suggested that the activity Doak could perform was consistent with the definition of light work." Id. at 29. Some courts interpret Doak to require the ALJ to base the RFC determination on an opinion from a medical source. See, e.g., Phillips v. Berryhill, Civ. No. 15-5024, 2017 WL 2224931, at *4 (E.D. Pa. May 22, 2017); Wright v. Colvin, Civ. No. 14-2350, 2016 WL 446876, at *16 (M.D. Pa. Jan. 14, 2016) ("The Third Circuit has continued to uphold the prohibition on lay reinterpretation of medical evidence, even when a state agency medical opinion indicates that the claimant is not disabled."), report and recommendation adopted, 2016 WL 452142 (M.D. Pa. Feb. 4, 2016). However, post-Doak cases from the Third Circuit indicate that this reading is too narrow. For example, in Chandler v.

Commissioner of Social Security, the Third Circuit held that "the ALJ is not precluded from reaching RFC determinations without outside medical review of each fact incorporated into the decision."  667 F.3d 356, 362 (3d Cir. 2011).  Moreover, the Third Circuit has noted that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC.  Surveying the medical evidence to craft an RFC is part of the ALJ's duties."  Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006).

More recently, the Honorable Cynthia Rufe of this court rejected a similar argument wherein the plaintiff relied on Doak to assert that "an ALJ's RFC findings must be based on at least one medical opinion in order to be supported by substantial evidence."  Cleinow v. Berryhill, 311 F. Supp.3d 683, 685 (E.D. Pa. 2018).

> But Doak does not stand for the proposition that an ALJ cannot make an RFC determination in the absence of a medical opinion reaching the same conclusion.  Such a rule would be inconsistent [with] the Third Circuit's express holding that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."  Rather the court in Doak held that the ALJ's opinion was unsupported because nothing in the record, which consisted of testimony and three medical reports, justified the ALJ's conclusion.  Contrary to Plaintiff's contention, [Titterington] and district court opinions . . .  clarify, rather than contradict, Doak's holding, and make clear that an ALJ is not restricted to adopting the conclusions of a medical opinion in making an RFC determination.

Id. (footnotes omitted) (quoting Chandler, 667 F.3d at 361, and citing Titterington, 174 F. App'x  at 11; Callahan v. Colvin, Civ. No. 13-1634, 2014 WL 7408700, at *1 n.1 (W.D. Pa. Dec. 30, 2014) ("The Third Circuit did nothing more [in Doak] than make a

substantial evidence finding in light of a limited record and did not purport to create a

rule that an RFC determination must be based on a specific medical opinion."));

Cummings v. Colvin, 129 F. Supp.3d 209, 215 (W.D. Pa. 2015) ("Doak does not, as

Plaintiff suggests, hold that an ALJ's RFC findings must be based on a particular medical

opinion")).

Here, the ALJ adequately explained her reasons for giving little weight to each of

the opinions offered, noting that, whether too restrictive (Ms. Shollenberger, Dr. Shenkel

and Ms. Miller/Dr. Walker), or too broad (Dr. Monfared and the state agency

consultants), the opinions were not supported by the diagnostic testing, predominantly

benign physical examinations, and Plaintiff's daily activities, or that the physician did not

have all of Plaintiff's treatment records when he or she offered an opinion.  Tr. at 121-

23.[38]  Where Plaintiff faults the ALJ for filling an evidentiary gap with her own

interpretation of the medical evidence, the Third Circuit has determined that it is the

ALJ's duty to craft an RFC after surveying the medical evidence.  Titterington, 174 F.

App'x at 11.  For the reasons discussed at length above, I find no error in the ALJ's

craftsmanship.

> 2.      Moderate Limitation in Concentration, Persistence and Pace

With respect to the ALJ's mental RFC assessment, Plaintiff complains that the

limitation in the RFC to unskilled work was insufficient to address the ALJ's conclusion

---

[38]With respect to Dr. Schenkel's assessment, the ALJ also noted that the only clinical finding to support significant limitations in standing, walking, sitting, lifting, carrying, etc., was the doctor's finding that Plaintiff had a limited range of motion in her neck.  Tr. at 122.

that Plaintiff has moderate limitations in maintaining concentration, persistence and pace.

Doc. 13 at 8.  Defendant responds that the ALJ properly accounted for Plaintiff's

moderate limitation in concentration, persistence, and pace, and that the ALJ's analysis

was consistent with recent Third Circuit caselaw.  Doc. 18 at 12-14.

Plaintiff relies on the Third Circuit's decision in Ramirez v. Barnhart, 372 F.3d

546, 554 (3d Cir. 2004), in which the court found that a limitation to simple tasks was

insufficient to account for a finding that Plaintiff "often" suffered from deficiencies in

concentration, persistence, or pace.[39]  However, shortly after Plaintiff filed her opening

brief in this case, the Third Circuit decided Hess v. Commissioner of Social Security, in

which the court held that a limitation to "simple tasks" is sufficient to account for

moderate limitations in concentration, persistence, and pace, if the ALJ provides a valid

explanation for his or her RFC determination.  931 F.3d 198, 210 (3d Cir. 2019).  The

Commissioner cited Hess in responding to Plaintiff's argument, Doc. 18 at 12-13,

although Plaintiff did not address Hess in her reply, refocusing her argument to assert that

the ALJ failed to address whether Plaintiff was limited by any off-task allowances.  Doc.

19 at 2-3.

---

[39]After a regulatory change from a frequency scale to a severity scale, in which "moderate" now holds the position that "often" did prior to the change, the Third Circuit issued three unreported cases finding that a limitation to simple tasks is sufficient to encompass moderate difficulties in concentration, persistence, or pace.  See Holley v. Comm'r of Soc. Sec., 590 F. App'x 167, 168 (3d Cir. 2014); McDonald v. Astrue, 293 F. App'x 941, 946 (3d Cir. 2008); Menkes v. Astrue, 262 F. App'x 410, 412 (3d Cir. 2008).

In <u>Hess</u>, the court rejected the notion that "incantations are required at steps four and five simply because a particular finding has been made at steps two and three."  931 F.3d at 209.  As to its prior holding, the court explained:

> <u>Ramirez</u> did not hold that there is any categorical prohibition against using a "simple tasks" limitation after an ALJ has found that a claimant "often" faces difficulties in "concentration, persistence, or pace."  Rather a "simple tasks" limitation is acceptable after such a finding, as long as the ALJ offers a valid explanation for it.

<u>Id.</u> at 212.  On the record before it, the Third Circuit determined that the ALJ had offered a "valid explanation" for the "simple tasks" limitation.

> [T]he ALJ explained at length and with sound reasoning why Hess's "moderate" difficulties in "concentration, persistence, or pace" were not so significant that Hess was incapable of performing "simple tasks."  For example, coupled with her finding that Hess had "moderate difficulties" in "concentration, persistence, or pace," the ALJ explained that Hess's "self-reported activities of daily living, such as doing laundry, taking care of his personal needs, shopping, working, and paying bills . . . are consistent with an individual who is able to perform simple, routine tasks."  In the same discussion, the ALJ also observed that "progress notes from treating and examining sources generally indicate no serious problems in this area of functioning, reporting that [Hess] could perform simple calculations, was fully oriented, and had intact remote/recent memory."

<u>Id.</u> at 213-14 (record citations omitted)[40]  The court also noted that the ALJ's "meticulous analysis" of the record at step four included discussion of MSEs and reports that indicated Hess could "function effectively."  <u>Id.</u> at 214.

---

[40]The Circuit Court also equated "unskilled work" with a limitation to "simple tasks."  <u>Hess</u> at 210 (citing 20 C.F.R.  §§ 404.1568(a), 416.968(a)).

My earlier discussion of the ALJ's consideration of the evidence focused on her physical RFC determination.  The ALJ also reviewed the mental health treatment evidence in a similarly thorough fashion, beginning prior to Plaintiff's alleged disability onset date. In her review of the evidence, the ALJ noted that Plaintiff had a history of anxiety and depression, but MSEs performed in August and September 2012 were normal, tr. at 113 (citing id. at 542, 543-44), and PA Fichthorn described Plaintiff's mood and affect as "much improved" in September.  Id. at 113 (citing id. at 542).  A year later, the ALJ noted that PA Fichthorn found Plaintiff's mood anxious and depressed, but found that she had normal orientation, cognitive function, judgment, thought content, affect, speech, memory, communication, and attention.  Id. at 113 (citing id. at 560-61).

In reviewing the mental health treatment records predating her alleged disability onset date, the ALJ noted continuing depression and anxiety including findings of anxious and depressed mood in the monthly records dating from October 2012 through July 2013, but that Plaintiff's speech was mostly normal, concentration and memory were mostly fair, and there were no abnormalities of fund of knowledge, cooperation, orientation, cognition, insight or judgment.  Tr. at 116 (citing id. at 796-814, 818-26).  From November 2013 to June 2014, the ALJ noted several abnormal observations on MSE including impaired judgment in November 2013, impairment in recent memory and anxious and depressed mood in February 2014, impaired judgment in March 2014, numb and constricted mood and affect in May 2014, and dysthymic mood and restricted affect in June 2014.  Id. at 116-17 (citing id. at 827-56).

The ALJ noted that at the alleged disability onset date, after Plaintiff's car accident, her psychiatric evaluation was normal.  Tr. at 117 (citing id. at 982 – noting normal mood, affect, behavior, and thought content).  Likewise, Plaintiff's MSEs at her neurologist in June, August, September, October, and December 2014 were normal.  Id. at 117-18 (citing id. at 1053-55, 1474-96).  Also, in her ongoing mental health treatment at the Family Guidance Center, the ALJ cited various deficiencies in her MSEs, including slow motor behavior, blunted and depressed affect, slightly impaired remote memory in May 2015, with diagnoses of PTSD, mild MDD, and traumatic brain injury, id. at 118 (citing id. at 1372-75), and depressed mood and affect, low volume and slow speech, but with normal attention, concentration and recent and remote memory in September 2015.  Id. at 118 (citing id. at 1366-69).  Similarly, the ALJ noted recurrent issues with Plaintiff's mood and affect in November 2015, throughout 2016, and through May 2017, but the remainder of these MSEs were predominantly normal.  Id. at 118-19 (citing 2398-415).

The ALJ also considered the psychiatric systems evaluations performed by Plaintiff's other treatment providers, including pulmonologist Dr. Shellenberger's notation of Plaintiff's normal mood, affect and behavior in September 2015, tr. at 119 (citing 1541-43),[41] and her internal medicine providers' normal psychiatric findings in August and September 2015, and February, May, and July 2016.  Id. at 119-20 (citing id. at 1560, 1615, 1967, 2035).  The ALJ noted that Dr. Chako observed Plaintiff's anxious mood, blunt affect, delayed speech, and impaired memory and cognition in October and

---

[41]The doctor also indicated that Plaintiff was "[n]egative for confusion and agitation."  Tr. at 1542.

November 2015, but that her MSE's were otherwise normal.  Id. at 119 (citing id. at 1643, 1910).  The ALJ noted that at the neurosurgeon's office in September 2017, nurse practitioner Karen Kimball noted that Plaintiff had flat affect, but normal orientation, speech and language functions and mentation.  Id. at 120 (citing id. at 3094). Dr. Bundy, Plaintiff's pain management specialist, noted normal mood and affect in July and September 2017.  Id. at 120-21 (citing id. at 2536, 3066).

Thus, the ALJ undertook a very thorough review of the record.  She explained that the treatment records, MSEs, and Plaintiff's reported daily activities belied her claim of disabling mental impairments.  See tr. at 122 (summarizing consideration of mental health treatment evidence in explaining weight given to assessment provided by Ms. Miller and Dr. Walker).  Because the ALJ provided a "valid explanation" for her RFC determination, limiting Plaintiff to unskilled work with no direct interaction with the public, the ALJ adequately addressed the moderate limitation in concentration, persistence, and pace, and the RFC assessment is not deficient.

As noted, in her reply brief, Plaintiff argues that the ALJ failed to include any limitation in the RFC assessment to address whether Plaintiff was limited by any off-task allowances and, if so, for what length of time.  Doc. 19 at 2.  Plaintiff's argument is based on a question the ALJ posed to the VE at the hearing.  After the VE identified specific jobs in response to the ALJ's hypotheticals, the ALJ asked if an individual would be able to maintain any work if he or she would be off-task or unproductive fifteen to twenty percent of the day due to frequent lapses in focus and concentration.  Tr. at 317.  The VE responded that such a limitation would preclude competitive unskilled work.  Id.

Plaintiff characterizes the ALJ as "discarding" the issues raised with the VE, and argues that the failure to include such a limitation in the RFC or explain her failure to do so constitutes error, citing district court cases arising in the Seventh Circuit.  Doc. 19 at 2-3.  In this Circuit, in order for VE testimony to provide substantial evidence to support the ALJ's decision, the hypothetical relied upon by the ALJ must reflect those impairments that are adequately supported by the record.  Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  The ALJ did not adopt an off-task limitation in the RFC, and Plaintiff fails to point to medical evidence in the record to demonstrate error in this regard.  The Third Circuit has rejected such an argument based solely on hypotheticals posed to the VE without underlying supportive medical evidence.  See Minch v. Comm'r of Soc. Sec., 715 F. App'x 158 (3d Cir. 2017) (rejecting argument that ALJ ignored VE response to hypothetical involving repetitive movement when such limitation was not supported by the record); see also Barzyk v. Saul, Civ. No. 18-2262, 2020 WL 1272511, at *14-15 (M.D. Pa. Feb. 18, 2020) (applying Minch to hypothetical involving time off-task); Miller v. Berryhill, Civ. No. 17-1810, 2019 WL 3716538, at *13-14 (M.D. Pa. July 22, 2019) (same).

Here, as discussed above, the ALJ limited Plaintiff to unskilled work with no direct interaction with the public.  Plaintiff has failed to ground her claim in any evidence in the record and the court finds no credible support for an off-task limitation.[42]  Thus, I find no error.

_____

[42]The ALJ explained that she gave the assessment completed by Ms. Miller and Dr. Walker limited weight because it was not supported by their own treatment notes or

3.      Evaluation of Plaintiff's Symptoms

Plaintiff also claims that the ALJ's evaluation of her claimed symptoms was flawed because the decision contains no discussion of which allegations the ALJ found inconsistent with the record and the ALJ improperly relied on Plaintiff's activities of daily living to undermine the severity of her symptoms.  Doc. 13 at 10-11.  Defendant responds that the ALJ properly considered Plaintiff's complaints and explained that Plaintiff's "excessive complaints" were inconsistent with the record.  Doc. 18 at 14.

In her decision the ALJ determined that Plaintiff's allegations were not entirely credible.

> [Plaintiff] alleges disability due to a traumatic brain injury and concussion, migraines, anxiety, depression, a shoulder disorder, and asthma.  [Plaintiff] alleges difficulties focusing, concentrating, and sleeping.  She said she sometimes has difficulty walking and sitting.  [Plaintiff] stated that she gets tired, and takes naps during the day.  She alleges daily headaches, which she said are unpredictable and last for hours.  [Plaintiff] is right handed and said she can only lift 10 pounds.  She stated that she becomes anxious around a lot of people, and gets panic and anxiety attacks, and crying spells.  [Plaintiff] alleges shoulder pain with activity.  [Plaintiff] alleges difficulties squatting, bending, reaching, kneeling, using her hands, and climbing stairs.  She alleges difficulties with her memory, understanding, following instructions, getting along with others, completing tasks, handling stress, and handling changes in routine.  [Plaintiff's] husband testified to similar allegations and difficulties of [Plaintiff].
> After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements, and those of her husband, concerning the intensity, persistence

the record as a whole, and was inconsistent with Plaintiff's statement of her activities. Tr. at 122-23.

>and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. [Plaintiff's] allegations, and those of her husband, are not entirely consistent with the array of activities she performs, and of which she is capable.  Further, [Plaintiff's] allegations, and those of her husband, are not entirely consistent with the relatively modest findings pursuant to examinations and diagnostic studies, as discussed below.

Tr. at 112.

First, Plaintiff complains that the ALJ did not identify which allegations were and were not consistent with the record and that Plaintiff's allegations need not be entirely consistent with the record.  Doc. 13 at 10.  Defendant responds that the ALJ is not required to parse out each subjective allegation for analysis.  Doc. 18 at 14.

Contrary to Plaintiff's assertion, the ALJ evaluated Plaintiff's complaints using the applicable regulations.  The governing regulations require a two-step evaluation of subjective symptoms:  (1) a determination as to whether there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, and (2) and evaluation of the intensity and persistence of the pain or other symptom and the extent to which it affects the individual's ability to work.  20 C.F.R. §§ 404.1529(b), (c) & 416.929(b), (c).  The ALJ is required to consider both the objective evidence of record and Plaintiff's subjective testimony.  See S.S.R. 16-3p, "Titles II and XVI:  Evaluation of Symptoms in Disability Claims," 2016 WL 1119029, at *4 (March 16, 2016).

As previously discussed at length, the ALJ undertook an extensive analysis of Plaintiff's treatment records and determined that Plaintiff's complaints were not entirely

consistent with the medical record and other evidence in the record and that finding is supported by substantial evidence as previously discussed.  "Even '[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for it.'" O'Donnell v. Comm'r of Soc. Sec., Civ. No. 19-1963, 2019 WL 5390696, at *2 (E.D. Pa. Oct. 21, 2019) (quoting Malloy v. Comm'r of Soc. Sec, 306 F. App'x 761, 763-64 (3d Cir. 2009)); see also Moon v. Berryhill, Civ. No. 18-323, 2018 WL 7002038, at *12 (M.D. Pa. Dec. 19, 2018), report and recommendation adopted, 2019 WL 162503 (M.D. Pa. Jan. 10, 2019) (citing SSR 16-3p to reject argument that the ALJ applied the wrong legal standard by finding allegations "not entirely consistent" with evidence).

Second, Plaintiff contends that the ALJ erred in relying on Plaintiff's activities "to undermine the severity of her symptoms," and argues that "a claimant 'need not be completely bedridden or unable to perform any household chores to be considered disabled.'"  Doc. 13 at 10 (quoting Reed v. Barnhart, 399 F.3d 917 (8th Cir. 2005)). Defendant responds that the "ALJ is permitted, indeed required, to consider a claimant's daily activities in evaluating her subjective complaints."  Doc. 18 at 15.

Defendant is correct.  Daily activities are one factor that an ALJ should consider in evaluating the intensity and limiting effects of a claimant's impairments.  20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).  The Third Circuit has explained that "[a]lthough certainly 'disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity,' it is nonetheless appropriate for the ALJ to consider 'the number and type of activities' in which the claimant engages."  Turby v.

Barnhart, 54 F. App'x 118, 122 n.1 (3d Cir. 2002) (quoting Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981), and Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002)).

Here, as previously discussed, the ALJ considered Plaintiff's activities, including her ability to care for her three daughters, care for her own personal needs and those of her youngest daughter, prepare crockpot meals and sandwiches, do laundry, and shop for groceries in evaluating Plaintiff's symptoms. Moreover, Plaintiff's activities were but one of the ALJ's considerations. She also evaluated the objective diagnostic studies and tests and the many findings on examination. I find no error in the ALJ's evaluation of Plaintiff's symptoms.

## IV.   **CONCLUSION**

The ALJ's decision is supported by substantial evidence. The ALJ's physical RFC assessment is supported by the medical records, including diagnostic studies and examination reports in the record, and Plaintiff's activities. Although the limitations found by the ALJ were not found in the opinion evidence, the ALJ properly crafted the RFC after an extensive review of the records and evidence in the record. The ALJ also provided a valid explanation for the limitation in the RFC assessment to account for Plaintiff's moderate limitation in concentration, persistence, and pace. Finally, the ALJ properly considered Plaintiff's symptoms and relied on her daily activities as one basis for her determination. Accordingly, I will affirm the Commissioner's decision denying Plaintiff benefits.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHERI STARR        :    CIVIL ACTION
             :
      v.        :
             :
ANDREW SAUL, Commissioner of   :    NO.  19-920
Social Security         :

## **O R D E R**

AND NOW, this   24th day of April, 2020, upon consideration of Plaintiff's

request for review (Doc. 13), the response (Doc. 18), the Plaintiff's reply (Doc. 19), and

after careful consideration of the administrative record (Doc. 8), IT IS HEREBY

ORDERED that:

   1.    Judgment is entered affirming the decision of the Commissioner of Social
       Security and the relief sought by Plaintiff is DENIED, and

   2.    The Clerk of Court is hereby directed to mark this case closed.

           BY THE COURT:

           /s/ ELIZABETH T. HEY

           _____

           ELIZABETH T. HEY, U.S.M.J.